UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

RILEY HANLEY,                          )
                                       )
            Plaintiff,                 )
                                       )
      v.                               )        Case No. 4:22-cv-01094-SRC
                                       )
UNUM LIFE INSURANCE COMPANY            )
OF AMERICA,                            )
                                       )
            Defendant.                 )

## Memorandum and Order

Shortly after falling and sustaining injuries, Suzanna Hanley[1] passed away.  Through her

employer, Mrs. Hanley had participated in an ERISA-governed welfare plan that Unum Life

Insurance Company insured.  After her death, her husband, Riley Hanley, filed claims for life-

insurance, supplemental-life-insurance, and accidental-death-and-dismemberment benefits.

Unum granted the first two—and overpaid them—but denied the third.  Mr. Hanley then sued

Unum for wrongful denial of benefits.  Unum counterclaimed seeking reimbursement of its

overpayment.  Now, both parties move for summary judgment on Mr. Hanley's claim, and Unum

moves for summary judgment on its counterclaim.

## I.      Background

### A.      The plan

The Court finds the following facts undisputed for purposes of summary judgment.  As

the widower of Suzanna Hanley, doc. 60 at ¶ 6, Mr. Hanley sued Unum under the Employee

Retirement Income Security Act.  Doc. 1 at ¶¶ 1, 2.  At the time of her death, Mrs. Hanley was

---

[1] Plaintiff's counsel spells Mrs. Hanley's first name alternatively as "Susanna" and "Suzanna." *Compare* doc. 1 at ¶¶ 14, 16, 19, 23, 25 ("Susanna"), *with id.* at ¶ 10 ("Suzanna").  The Court uses the spelling of Mrs. Hanley's death certificate:  "Suzanna."  Doc. 1-1.

employed by Kindred Healthcare Operating, Inc. and participated in its Employee Medical and Welfare Benefits Plan—with Mr. Hanley as her designated beneficiary.  Doc. 60 at ¶¶ 2, 7, 8. Her plan coverage included basic-life insurance, supplemental-life insurance, and accidental-death-and-dismemberment insurance.  Doc. 57 at ¶¶ 2, 4.

Kindred purchased an insurance policy from Unum to fund the benefits available under its plan.  Doc. 60 at ¶ 4.  The plan grants Unum discretionary authority to interpret the plan and make benefit determinations:

> The Plan, acting through [Kindred], delegates to Unum and its affiliate Unum Group discretionary authority to make benefit determinations under the Plan. . . . Benefit determinations include determining eligibility for benefits and the amount of any benefits, resolving factual disputes, and interpreting and enforcing the provision of the Plan.  All benefit determinations must be reasonable and based on the terms of the Plan and the facts and circumstances of each claim.

*Id.* at ¶ 9 (quoting doc. 56 at 138).

Under the plan, Unum pays accidental-death benefits only if an "accidental bodily injury results in" a covered loss, including death.  *Id.* at ¶ 10 (quoting doc. 56 at 118).  Further, the plan defines "accidental bodily injury" as "bodily harm caused solely by external, violent and accidental means and not contributed to by any other cause."  *Id.* at ¶ 11 (quoting doc. 56 at 129). The plan also includes several exclusions.  Doc. 57 at ¶ 10.  Under the medical-treatment exclusion, the policy "does not cover any accidental losses caused by, contributed to by, or resulting from: . . . medical or surgical treatment."  Doc. 60 at ¶ 12 (quoting doc. 56 at 122). And under the drug-use exclusion, the "plan does not cover any accidental losses caused by, contributed to by, or resulting from: . . . the use of any prescription or non-prescription drug, poison, fume, or other chemical substance unless used according to the prescription or direction of [the] dependent's physician."  Doc. 57 at ¶ 10 (quoting doc. 56 at 122).

Further, the plan provides that if Unum overpays a claim, Unum "has the right to recover any overpayments due to . . . any error Unum makes in processing a claim." Doc. 62 at ¶ 7. Also, the recipient "must reimburse [Unum] in full.  [Unum] will determine the method by which the repayment is to be made." *Id*.

### B.    Suzanna Hanley's death

Mrs. Hanley suffered from peripheral vascular disease, doc. 57 at ¶ 16, which she treated with aspirin and Plavix, *see id.* at ¶¶ 63, 66; *see also* doc. 59 at 1.  On October 15, 2021, Mrs. Hanley fell and hit her head on concrete.  Doc. 57 at ¶ 13 (citing doc. 56-1 at 430).  Later that day, she went to the hospital with a severe headache, severe nausea, and active vomiting.  *Id*. at ¶ 14 (citing doc. 56-2 at 101).

At the hospital, Mrs. Hanley received a "head CT."  Doc. 60 at ¶ 19 (citing doc. 56-2 at 126).  During treatment, medical personnel noted her aspirin and Plavix use:  "[t]rauma on anticoagulation [(process of hindering blood clotting)]," *id.*; "Anticoagulants [(blood thinners)]/anti-platelet agents:  See chart.  Aspirin and Plavix.  Patient being reversed," *id*. at ¶ 20 (quoting doc. 56-2 at 113); and "reversal of anticoagulation" required, *id*. at ¶ 22 (quoting doc. 56-2 at 190).  (The Court provides some plain-English translation of medical terms, based on dictionary definitions, to make this order more commonly understandable.  In doing so, the Court does not alter or modify the administrative record.)

That same evening, Mrs. Hanley underwent a "right frontoparietotemporal craniotomy and complete evacuation of acute SDH [subdural hematoma]" (brain surgery).  *Id*. at ¶ 21 (citing doc. 56-2 at 136–37).  The doctor noted the existence of a "small bleeding vessel in the surface of the brain that was coagulated [(clotted)] with no active bleeding observed at the time of

closure." *Id*. at ¶ 23 (quoting doc. 56-2 at 138).  After, personnel sought to "avoid[] antiplatelet therapy or anticoagulants." *Id*. at ¶ 24 (quoting doc. 56-2 at 154).

Mrs. Hanley initially did well post-operation. *Id*. at ¶ 25.  But then, a few hours later, she experienced further medical complications:  "sudden spike in blood pressure, became bradycardic, and her pupils became non-reactive." *Id*. (citing doc. 56-2 at 140).  After, she underwent a second head CT, and the doctor recommended further surgery. *Id*. at ¶¶ 26–27 (first citing doc. 56-2 at 124–25; then citing *id*. at 140).  At this point, Mr. Hanley informed the doctor that Mrs. Hanley "had been bruising excessively over the last six months over her arms, torso, legs and even neck without any obvious trauma."  Doc. 60 at ¶ 27 (quoting doc. 56-2 at 140).

Before the second surgery, personnel gave Mrs. Hanley "all appropriate blood products for ASA [(aspirin)] and [P]lavix." *Id*. at ¶ 28 (quoting doc. 56-2 at 188).  After the surgery, personnel noted under both "PRE-OP" and "POST-OP DIAGNOSIS," "Plavix/ASA induced coagulopathy [(condition affecting blood's clotting ability)]." *Id*. at ¶ 30 (quoting doc. 56-2 at 139).  And under "FINDINGS," they noted, "There was diffuse oozing and hemostasis [("stoppage of bleeding," doc. 56-3 at 67)] [w]as incredibly difficult to achieve."  Doc. 60 at ¶ 30 (quoting doc. 56-2 at 140).  Further, the doctor noted that the surgery occurred "in the setting of extreme coagulopathy and cerebral edema [(brain swell)]," *id*. at ¶ 32 (quoting doc. 56-2 at 166), and that "[t]here is also hemorrhage [(bleeding)] in the brainstem.  Given the clinical situation and exam findings, the patient has a poor prognosis." *Id*.

Five days after the fall, Mrs. Hanley passed away. *Id*. at ¶ 34.  Soon after, a medical examiner investigated Mrs. Hanley's death without performing an autopsy. *Id*. at ¶ 35 (quoting doc. 56-3 at 130).[2]  The examiner identified the "probable cause of death" as "ACUTE

---

[2] Unum erroneously cites to "AR 630" (doc. 56-1 at 130), rather than "AR 1630" (doc. 56-3 at 130).

SUBDURAL HEMORRHAGE SEQUELA [(collection of blood between the brain and skull)]"
due to "BLUNT FORCE TRAUMA TO HEAD," which was due to "FALL." *Id*. at ¶ 36
(quoting doc. 56-3 at 130). Further, the examiner marked the "manner of death" as "accident,"
*id*. at ¶ 37 (quoting doc. 56-3 at 130), as did the death certificate, doc. 57 at ¶ 38.

### C.     Payment of life-insurance benefits

After his wife's death, Mr. Hanley submitted claims for life and accidental-death
benefits. Doc. 60 at ¶ 13 (citing doc. 56 at 363–65). Unum pays life insurance benefits by
depositing funds into a retained-asset account—an account Unum establishes at the Bank of New
York Mellon for the participant. *Id*. at ¶ 11. On December 20, 2021, Unum initially deposited
$46,150 for basic-life insurance and $137,150 for supplemental-life insurance into Mr. Hanley's
retained-asset account. *Id*. at ¶ 12. Then four days later, Unum deposited another $46,150 into
Mr. Hanley's retained-asset account. *Id*. And about three weeks later, Unum deposited $91,650
into this same account. *Id*. The additional deposits occurred because Unum mistakenly set up
two claims for Mrs. Hanley—including one with an incorrect Social Security number and
incorrect spelling of Mrs. Hanley's name. *Id*. at ¶ 24.

During and after these deposits, Mr. Hanley withdrew funds from the retained-asset
account. *Id*. at ¶ 13. Further, he transferred money to two different accounts at Edward Jones—
a holding account and an investment account. *Id*. at ¶¶ 14–15, 18. Before Mr. Hanley deposited
money into these accounts, each account had a balance of $0. *Id*. at ¶¶ 16, 19.

After realizing its error six months later, Unum contacted Mr. Hanley's counsel
requesting return of the $137,800 overpayment. *Id*. at ¶ 23. Counsel responded and requested
Unum "toll its efforts to recoup the overpayment until the AD&D administrative appeal process
has completed." *Id*. at ¶ 25. Neither this letter nor Mr. Hanley's subsequent appeal mentioned or

disputed either the overpayment or Unum's request for return of the overpayment.  *Id*. at ¶¶ 25, 26.

### D.    Denial of accidental-death benefits

Unlike the life benefits, Unum denied the accidental-death-benefits claim.  Doc. 60 at ¶¶ 15, 39.  During Unum's review process, it obtained a copy of Mrs. Hanley's medical file.  *Id*. at ¶ 16.  Also, it obtained a copy of the medical examiner's report.  *Id*. at ¶ 35.  During this process, Marnie Webb, a registered nurse, reviewed and summarized the medical records.  *Id*. at ¶ 17.

In February 2022, Unum denied the claim for accidental-death benefits, relying on the medical records and Nurse Webb's opinion.  *Id*. at ¶ 39.  After summarizing the medical records, Nurse Webb opined that Mrs. Hanley's anticoagulant use contributed to her death:

> [T]he insured sustained traumatic subdural hematomas in a fall from steps just above ground level.  She hit her head on concrete but did not lose consciousness. MRI did not show any skull fractures to support major external trauma.  The fall, however, occurred in the setting of treatment with aspirin and Plavix for history of PVD.  Aspirin and Plavix are anti-platelet meds (i.e., anticoagulation therapy or blood thinners) that may cause spontaneous intracranial bleeding and/or significantly increase the risk of bleeding with relatively minor trauma such as that noted.  The neurosurgeon noted that the insured had extreme coagulopathy, which was secondary to use of aspirin and Plavix.  Despite surgical intervention, the insured had recurrent bleeding due to this extreme coagulopathy that resulted in neurological deterioration and eventual death.
>
> Based on the available MRs, it is reasonable that the insured's medical treatment with aspirin and Plavix (which was medical treatment for peripheral vascular disease) significantly contributed to her death.

*Id*. at ¶ 38 (quoting doc. 56-3 at 68).

In other words, Nurse Webb opined that Mrs. Hanley died because of bleeding between her skull and brain after a seemingly minor fall.  This fall occurred when Mrs. Hanley was taking blood thinners, which increase the risk of bleeding after minor injury.  Further, the doctor connected Mrs. Hanley's excessive bleeding with her blood-thinner use.  This excessive bleeding led to her death.

Unum's denial letter adopted the opinion of Nurse Webb.  In doing so, it cited to the

plan's accidental-bodily-injury definition and the medical-treatment exclusion.  *Id*. at ¶ 40.  First,

Unum found the death non-accidental, as defined by the plan:

> [Accidental Death benefits are not payable when the death is] not due to bodily
> harm caused solely by external, violent and accidental means or was contributed to
> by any other cause.  It has been determined that Suzanna's death was contributed
> to by a medical condition for which she was treating with aspirin and Plavix for
> peripheral vascular disease; this is not considered to be accidental and was
> contributed to by another cause.

Doc. 57 at ¶ 52 (quoting doc. 56-3 at 105).  Next, Unum applied an exclusion:

> There is an exclusion in the policy that applies to this claim.  The exclusion states
> that benefits are not payable when the loss was caused by, contributed to by or
> resulted from disease of the body.  Since her death was contributed to by her
> medical treatment with aspirin and Plavix for her peripheral vascular disease, which
> is a disease of the body, this policy exclusion also applies to our decision.

*Id*. at ¶ 53 (quoting doc. 56-3 at 105).

Several months later, Mr. Hanley appealed Unum's denial.  Doc. 60 at ¶ 41.  In his appeal

letter, Mr. Hanley argued that no evidence showed Mrs. Hanley died due to her anticoagulant

use:

> [A]t no point did the physicians treating her in the hospital attribute Susanna's death
> to blood thinners.  Likewise, the death certificate does not reflect that medications
> were the cause of Susanna's death.  Rather, Unum's nurse has unilaterally declared,
> without evidence to support her conclusions, that blood thinners caused Susanna's
> death—not the fall that put her in the hospital which has nothing to do with PVD
> or the effect of blood thinners.

*Id*. at ¶¶ 42–44 (quoting 56-4 at 184).  Mr. Hanley provided no outside medical opinion to

support his argument.  *Id*. at ¶ 45.  Further, Mr. Hanley argued that the medical-treatment

exclusion conflicted with the drug-use exclusion, *id*. at ¶ 46, and that he should be entitled to

benefits under the drug-use exclusion, doc. 57 at ¶ 66.

Soon after, Unum denied the appeal.  Doc. 60 at ¶ 47.  This second-denial letter noted,

"Upheld—no investigation."  Doc. 57 at ¶ 68 (quoting doc. 56-4 at 268).  Again, the letter cited

both the accidental-bodily-injury definition and the medical-treatment exclusion.  Doc. 60 at ¶ 52

(citing doc. 56-4 at 265).  And it stated the medical-treatment exclusion applied:

> The exclusion in the policy applied states the plan does not cover any accidental losses caused by, contributed to by, or resulting from a disease of the body or diagnostic, medical or surgical treatment or mental disorder.  She had extreme coagulopathy, which was secondary to use of aspirin and Plavix for PVD.  Despite surgical intervention, she had recurrent bleeding due to the extreme coagulopathy that resulted in neurological deterioration and death.

Doc. 57 at ¶ 74 (quoting doc. 56-4 at 264).  Finally, it contested Mr. Hanley's argument that the

drug-use exclusion applied:  "We respectfully disagree.  The exclusion we are applying is related

to disease of the body or diagnostic, medical or surgical treatment."  *Id*. at ¶ 75 (quoting doc. 56-

4 at 264).

In sum, Unum's second-denial letter applied the medical-treatment exclusion to Mrs.

Hanley's death.  It excludes coverage when medical treatment contributes to the death.  Unum

found that Mrs. Hanley's blood-thinner use caused excessive bleeding.  And this excessive

bleeding eventually led to her death.

### E.    Subsequent lawsuit

After this final denial, Mr. Hanley sued Unum.  *Id*. at ¶ 77.  Then Unum filed a

counterclaim for reimbursement of its overpayment.  Doc. 12.  Mr. Hanley moved for leave to

conduct discovery beyond the administrative record, doc. 41, which the Court denied, doc. 43.

Finally, Mr. Hanley and Unum filed cross-motions for summary judgment, docs. 46, 49, and

Unum filed a summary-judgment motion on its counterclaim, doc. 52.  The Court addresses

these summary-judgment motions.

## II.    Summary-judgment standard of review

Under Rule 56(a) of the Federal Rules of Civil Procedure, "[a] party may move for

summary judgment, identifying each claim or defense—or the part of each claim or defense—on

which summary judgment is sought."  Rule 56(a) also provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  In ruling on a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from the underlying facts. *AgriStor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir. 1987).  The moving party bears the initial burden of showing both the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); Fed. R. Civ. P. 56(a).

In response to the proponent's showing, the opponent must "come forward with 'specific facts showing that there is a genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)).  Self-serving, conclusory statements without support will not suffice to defeat summary judgment.  *Keiran v. Home Cap., Inc.*, 858 F.3d 1127, 1132 (8th Cir. 2017) (citing *Chavero-Linares v. Smith*, 782 F.3d 1038, 1041 (8th Cir. 2015)).

Further, to determine whether the disputed facts are material, courts "examine the evidence in the context of the legal issues involved."  *Lower Brule Sioux Tribe v. State of S.D.*, 104 F.3d 1017, 1021 (8th Cir. 1997).  The existence of disputed facts alone does not prevent summary judgment.  *Id*.  Rather, "the dispute[s] must be outcome determinative under prevailing law."  *Id*. (quoting *Holloway v. Pigman,* 884 F.2d 365, 366 (8th Cir. 1989)).

"Where . . . each side moves for summary judgment, each concedes that for purposes of his own motion there is no genuine factual issue; however, the fact that both sides move for summary judgment does not necessarily establish that the case is a proper one for summary

9

disposition under the Rule." *Young v. Sw. Bell Tel. Co.*, 309 F. Supp. 475, 476 (E.D. Ark. 1969), *aff'd*, 424 F.2d 256 (8th Cir. 1970). "[W]hen simultaneous cross-motions for summary judgment on the same claim are before the court, the court must consider the appropriate evidentiary material identified and submitted in support of both motions, and in opposition to both motions, before ruling on each of them." *Houlihan Trading Co. v. CTI Foods, LLC*, No. 4:21-CV-01030-SRC, 2023 WL 130538, at *4 (E.D. Mo. Jan. 9, 2023) (quoting *Tulalip Tribes of Wash. v. Washington*, 783 F.3d 1151, 1156 (9th Cir. 2015)). "Although it is well-settled that the court must decide each motion for summary judgment on its own merits, this does not mean that 'each motion must be considered in a vacuum. Where, as here, cross-motions for summary judgment are filed simultaneously, or nearly so, the district court ordinarily should consider the two motions at the same time,' applying the same standards to each motion." *Id.* (quoting *Wells Real Est. Inv. Tr. II, Inc. v. Chardon/Hato Rey P'ship, S.E.*, 615 F.3d 45, 51 (1st Cir. 2010)).

## III.   Cross-motions for summary judgment

### A.   ERISA standard

Under ERISA, a plan beneficiary may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). While ERISA itself does not specify a standard of review, "the Supreme Court has held that a reviewing court should use a *de novo* standard of review unless the plan gives the 'administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.'" *Cash v. Wal-Mart Grp. Health Plan*, 107 F.3d 637, 640–41 (8th Cir. 1997) (quoting *Donaho v. FMC Corp.*, 74 F.3d 894, 897 (8th Cir. 1996), *abrogated on other grounds by Black & Decker Disability Plan v. Nord*, 538 U.S. 822 (2003) (quoting *Firestone Tire & Rubber Co. v. Bruch*,

489 U.S. 101, 115 (1989))).  "If the plan gives such discretionary authority, the court reviews the

plan administrator's decision for abuse of discretion."  *Id*. at 641 (citing *Donaho,* 74 F.3d at

898).

Under the abuse-of-discretion standard, the court applies a deferential standard of review

to the administrator's plan interpretation and fact-based determinations.  *Donaho*, 74 F.3d at 898.

With this, the court determines only "whether the [plan administrator's] decision was

'reasonable.'"  *Ruessler v. Boilermaker-Blacksmith Nat'l Pension Tr. Bd. of Trustees*, 64 F.4th

951, 959 (8th Cir. 2023) (citing *Roehr v. Sun Life Assurance Co. of Can.*, 21 F.4th 519, 525 (8th

Cir. 2021)).  And the court "must uphold [a plan administrator's] decision so long as it is based

on a reasonable interpretation of the [p]lan and is supported by substantial evidence."  *Id.*

(quoting *Ingram v. Terminal R.R. Ass'n of St. Louis Pension Plan for Nonschedule Emps*., 812

F.3d 628, 634 (8th Cir. 2016)).

In this analysis, the court must not "substitute [it's] own weighing of the evidence for that

of the administrator." *McIntyre v. Reliance Standard Life Ins. Co*., 73 F.4th 993, 1000 (8th Cir.

2023) (*McIntyre II*) (quoting *Gerhardt v. Liberty Life Assur. Co. of Bos.*, 736 F.3d 777, 780 (8th

Cir. 2013)).  Rather, "[a] decision is reasonable if a reasonable person *could* have reached a

similar decision, given the evidence before him, not that a reasonable person *would* have reached

that decision."  *Id*. (emphasis in original) (quoting *Ingram*, 812 F.3d at 634).  "Only when the

evidence relied on is overwhelmed by contrary evidence may the court find an abuse of

discretion.  *Id*. (quoting *Whitley v. Standard Ins. Co.*, 815 F.3d 1134, 1142 (8th Cir. 2016)).

Further, procedural irregularities and conflicts of interest do not change the standard of review,

but the court considers "them when determining whether the plan administrator abused its

11

discretion." *Id.* (citing *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 116 (2008); *McIntyre v. Reliance Standard Life Ins. Co.*, 972 F.3d 955, 963 (8th Cir. 2020) (*McIntyre I*)).

**B.    Discussion**

In their cross-motions for summary judgment, the parties address the same question: whether Unum abused its discretion in denying Mr. Hanley's claim. *See* doc. 49 at ¶ 3; doc. 46 at 1. The parties do not dispute that the plan gives Unum discretionary authority. Doc. 60 at ¶ 9; *see also* doc. 56 at 138 ("The Plan, acting through [Kindred], delegates to Unum and its affiliate Unum Group discretionary authority to make benefit determinations under the Plan. . . . Benefit determinations include determining eligibility for benefits and the amount of any benefits, resolving factual disputes, and interpreting and enforcing the provision of the Plan"). But still, the parties dispute the proper standard to apply. Unum argues the traditional abuse-of-discretion standard governs. Doc. 47 at 3. Mr. Hanley argues the Court should apply a "less deferential . . . modified abuse of discretion standard." Doc. 50 at 4–5.

Mr. Hanley provides three reasons the Court should apply a less deferential standard. For the first and second, Mr. Hanley alleges Unum committed two "highly prejudicial procedural irregularities": (1) relying upon the medical opinion of a "captive nurse" and (2) "cho[osing] not to conduct any investigation or review of the new documents submitted upon appeal." *Id*. at 6–8. For the third, Mr. Hanley argues Unum possesses an "inherent conflict of interest." *Id*. at 5.

The Court previously rejected similar procedural-irregularity arguments when Mr. Hanley moved for leave to conduct discovery beyond the administrative record. Doc. 43; *see also* doc. 41. "To alter the standard of review or affect [the court's] review under the abuse-of-discretion standard, a procedural irregularity must rise to the level of a 'serious breach of the plan trustee's fiduciary duty to the plan beneficiary.'" *Waldoch v. Medtronic, Inc.*, 757 F.3d 822,

830 (8th Cir. 2014), *as corrected* (July 15, 2014) (quoting *Menz v. Procter & Gamble Health Care Plan*, 520 F.3d 865, 869 (8th Cir. 2008)).  "The procedural error must leave 'the court with serious doubts as to whether the result reached was the product of an arbitrary decision or the plan administrator's whim.'"  *Id.* at 831 (citations omitted).

As earlier decided, the Court cannot conclude that either circumstance amounts to a procedural irregularity:  "Mr. Hanley's motion gives the Court no reason to suppose that Unum's employing a registered nurse, rather than a physician, to review the claim constitutes a serious procedural irregularity."  Doc. 43 at 5–6 (quoting doc. 41 at 3).  Further, Unum's notation of "Upheld—no investigation" in its final denial letter, doc. 57 at ¶ 68, does not show Unum's decision "was the product of an arbitrary decision or the plan administrator's whim."  *Waldoch*, 757 F.3d at 830.  On the contrary, Unum obtained both the medical records, doc. 60 at ¶ 16, and the medical examiner's report, *id.* at ¶ 35, during its review, and it referred to the medical records when denying the claim, *see, e.g., id.* at ¶ 38.  Also, in his appeal, Mr. Hanley provided no outside medical opinion for Unum to review.  *Id.* at ¶ 45.  Because of this, the Court again does not find any procedural irregularities.

Addressing Mr. Hanley's final argument, the Court assumes—and Unum admits, doc. 58 at 3—that Unum possesses a conflict of interest as both administrator and payor.  But this does not alter the discretionary standard:  "[A]ny conflict of interest is just a factor to be weighed in the abuse of discretion analysis."  *Ruessler*, 64 F.4th at 958 (citations omitted).  As such, the Court applies an abuse-of-discretion standard and considers the alleged conflict of interest in the analysis.

In his motion, Mr. Hanley opposes both reasons Unum provided for denying Mr. Hanley's claim:  (1) the death did not qualify as an "accidental loss" as defined by the plan, and

(2) the medical-treatment exclusion applied to the facts.  Doc. 50 at 1–15.  The Court addresses the arguments below.

First, Mr. Hanley contests Unum's application of the plan's definition of "accidental bodily injury."  *Id*. at 9–12.  Unum pays accidental-death benefits only if an "accidental bodily injury results in" a covered loss, including death.  Doc. 60 at ¶ 10 (citing doc. 56 at 118).  Further, the plan specifically defines "accidental bodily injury" as "bodily harm caused solely by external, violent and accidental means and not contributed to by any other cause."  *Id*. at ¶ 11 (quoting doc. 56 at 129).  Addressing this provision, Mr. Hanley argues that Unum's determination—that aspirin and Plavix contributed to Mrs. Hanley's death—is "not supported by the evidence claim file, and is pure speculation."  Doc. 50 at 10.

In arguing this, Mr. Hanley asks the Court to rely on his interpretation of the medical records and online sources not presented during Unum's review.  But the Court may not do so.  "In ERISA cases, the general rule is that review is limited to evidence that was before the administrator."  *Jones v. ReliaStar Life Ins. Co.*, 615 F.3d 941, 945 (8th Cir. 2010) (citing *LaSalle v. Mercantile Bancorporation, Inc. Long Term Disability Plan,* 498 F.3d 805, 811 (8th Cir. 2007).  "Such additional evidence gathering is ruled out on deferential review . . . to ensure expeditious judicial review of ERISA benefit decisions and to keep district courts from becoming substitute plan administrators." *Brown v. Seitz Foods, Inc., Disability Ben. Plan*, 140 F.3d 1198, 1200 (8th Cir. 1998) (internal quotation marks removed) (quoting *Cash,* 107 F.3d at 641–42).

The Court previously denied discovery outside of the administrative record.  Doc. 43.  As such, the Court may not evaluate Mr. Hanley's explanations of subdural hematomas, doc. 57 at ¶ 15, Kcentra, *id*. at ¶ 18, DDAVP, *id*. at ¶ 19, and various tests, *id*. at ¶¶ 20–26, 29, 33.  Mr.

Hanley failed to bring these arguments to the administrator.  Thus, they fall outside the administrative record, making them unreviewable.  *See Jones*, 615 F.3d at 945.  (Also, Mr. Hanley mentions that the medical examiner and death certificate labeled Mrs. Hanley's death an accident, *see* doc. 50 at 2, 10; doc. 51 at ¶¶ 37–38, but he does not make any argument regarding these facts, *see* doc. 50.)

Regardless, Unum presents a reasonable interpretation supported by substantial evidence. *See Ruessler*, 64 F.4th at 959 (quoting *Ingram*, 812 F.3d at 634).  Mr. Hanley essentially argues the hospital mitigated the risks posed by the anticoagulants while Unum argues the anticoagulants still contributed to Mrs. Hanley's death.  Unlike Mr. Hanley's contention, *see* doc. 50 at 10, Unum supports its argument with substantial evidence from the medical records.

The records show that, throughout Mrs. Hanley's treatment, medical personnel considered and addressed her anticoagulant use:  "[t]rauma on anticoagulation,"  doc. 60 at ¶ 19; "Anticoagulants/anti-platelet agents:  See chart.  Aspirin and Plavix.  Patient being reversed," *id*. at ¶ 20 (quoting doc. 56-2 at 113); "reversal of anticoagulation" required, *id*. at ¶ 22 (quoting doc. 56-2 at 190); "avoiding antiplatelet therapy or anticoagulation,"  *id*. at ¶ 24 (quoting doc. 56-2 at 154); giving her "all appropriate blood products for ASA and Plavix,"  *id*. at ¶ 28 (quoting doc. 56-2 at 188).  But even with this mitigation, the records connect Mrs. Hanley's anticoagulant use with medical complications.  For example, after the second surgery, personnel diagnosed "Plavix/ASA induced coagulopathy."  *Id*. at ¶ 30 (quoting doc. 56-2 at 139).  And they noted, "There was diffuse oozing and hemostasis [w]as incredibly difficult to achieve."  *Id*. (quoting doc. 56-2 at 140).  Further, the doctor noted that the surgery occurred "in the setting of extreme coagulopathy and cerebral edema."  *Id*. at ¶ 32 (quoting doc. 56-2 at 166).

Unum accessed these medical records during its review, doc. 60 at ¶ 16, and determined that Mrs. Hanley's anticoagulant use contributed to her death:

> The fall . . . occurred in the setting of treatment with aspirin and Plavix for history of PVD. Aspirin and Plavix are anti-platelet meds (i.e., anticoagulation therapy or blood thinners) that may cause spontaneous intracranial bleeding and/or significantly increase the risk of bleeding with relatively minor trauma such as that noted. The neurosurgeon noted that the insured had extreme coagulopathy, which was secondary to use of aspirin and Plavix. Despite surgical intervention, the insured had recurrent bleeding due to this extreme coagulopathy that resulted in neurological deterioration and eventual death.
>
> Based on the available MRs, it is reasonable that the insured's medical treatment with aspirin and Plavix (which was medical treatment for peripheral vascular disease) significantly contributed to her death.

*Id*. at ¶ 38 (quoting doc. 56-3 at 68). This determination pointed to specific information in the medical records. And although the medical records present potentially conflicting evidence, the evidence Unum relied on was not "overwhelmed by contrary evidence." *McIntyre II*, 73 F.4th at 1000 (quoting *Whitley*, 815 F.3d at 1142). Because a "reasonable person *could* have reached a similar decision," *id*. (emphasis in original) (quoting *Ingram*, 812 F.3d at 634), the Court finds that Unum reasonably found no accidental bodily injury.

Second, Mr. Hanley contests Unum's application of the medical-treatment exclusion in lieu of the drug-use exclusion. He argues that "[e]ven if the evidence showed that blood-thinners caused or contributed to Mrs. Hanley's death, benefits would be payable under the policy's exception for 'medication as prescribed.'" Doc. 50 at 12. Essentially, Mr. Hanley argues that Unum's interpretation of the policy terms is unreasonable. *Id*. at 13.

The Eighth Circuit uses a factor-based analysis to assess whether a plan interpretation is reasonable: (1) whether the interpretation conforms to the plan's goals; (2) whether the interpretation renders any plan language "meaningless or internally inconsistent"; (3) whether the interpretation "conflicts with the substantive or procedural requirements of the ERISA

16

statute"; (4) whether the administrator has "interpreted the words at issue consistently"; and (5) whether the interpretation contradicts "clear language of the [p]lan." *Ruessler*, 64 F.4th at 959 (quoting *King v. Hartford Life & Accident Ins. Co.*, 414 F.3d 994, 999 (8th Cir. 2005). Ultimately though, "the analysis remains whether the interpretation of the provision is 'reasonable.'" *Id*. (quoting *King*, 414 F.3d at 999).

Although Mr. Hanley addresses four of the five factors, his argument hinges on one factor:  whether the interpretation renders any plan language "meaningless or internally inconsistent."  *See id*.  Overall, Mr. Hanley argues Unum's "interpretation of the policy renders the prescription drug exception illusory."  Doc. 50 at 13.  In response, Unum argues it reasonably applied the medical-treatment exclusion instead of the drug-use exclusion.  Doc. 58 at 10.

In both its first and second denial, Unum applied the medical-treatment exclusion to Mr. Hanley's claim.  *See* doc. 57 at ¶ 53; doc. 60 at ¶ 52; *see also* doc. 60 at ¶ 12 (the policy "does not cover any accidental losses caused by, contributed to by, or resulting from: . . . medical or surgical treatment.").  Specifically, Unum found that Mrs. Hanley's "medical treatment with aspirin and Plavix" contributed to her death.  Doc. 57 at ¶ 53.  And after Mr. Hanley argued the drug-use exclusion applied, Unum stated, "We respectfully disagree.  The exclusion we are applying is related to disease of the body or diagnostic, medical or surgical treatment."  Doc. 57 at ¶ 75.

As a preliminary matter, Unum reasonably applied the medical-treatment exclusion.  A reasonable interpretation of "medical treatment" includes prescription-drug use.  *See, e.g.*, *Kutten v. Sun Life Assur. Co. of Canada*, 759 F.3d 942, 945 (8th Cir. 2014) ("Drawing a sharp distinction between 'prescribed drugs or medicines' and 'medical treatment' is a virtually impossible task because 'prescribed drugs or medicines,' as the words are commonly understood,

are forms of 'medical treatment.'").  Further, as discussed above, substantial evidence shows that Mrs. Hanley's anticoagulant use contributed to her death.  With this evidence, a reasonable person could have concluded that Mrs. Hanley's anticoagulant use contributed to her death.  And since a reasonable person *could* have reached a similar decision, Unum's application was reasonable.  *See McIntyre II*, 73 F.4th at 1000 (quoting *Ingram*, 812 F.3d at 634).

More to the point, Unum reasonably concluded that the drug-use exclusion does not apply here and, further, that the medical-treatment and drug-use exclusions do not conflict.  When "the terms of a plan are susceptible to multiple, reasonable interpretations, an administrator's choice among the reasonable interpretations is not an abuse of discretion."  *Donaldson v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 863 F.3d 1036, 1040 (8th Cir. 2017) (citations omitted).  Further, "[a]ny reasonable decision will stand, even if the court would interpret the language differently as an original matter."  *Manning v. Am. Republic Ins. Co.*, 604 F.3d 1030, 1038 (8th Cir. 2010) (citing *King*, 414 F.3d at 998–99).

Admittedly, Mr. Hanley presents a reasonable interpretation of the exclusions.  The medical-treatment exclusion excludes any accidental loss "caused by, contributed to by, or resulting from: . . . medical or surgical treatment."  Doc. 60 at ¶ 12.  And the drug-use exclusion excludes any accidental loss "caused by, contributed to by, or resulting from: . . . the use of any prescription or non-prescription drug . . . unless used according to the prescription or direction of your dependent's physician."  Doc. 57 at ¶ 10.  Under Mr. Hanley's reading, the "unless" clause provides an exception to the medical-treatment exclusion:  "the Plan promises to pay claims based on accidental deaths caused by medication used as prescribed."  Doc. 50 at 13; *see also* doc. 59 at 6–7 ("If the terms of the [p]lan were properly applied, a claim could only be denied under the 'Medical Treatment Exclusion' if the 'medical treatment' at issue was something other

18

than properly taken prescription medications.").  Others have interpreted such provisions

similarly.  *See, e.g.*, *Clark v. Metro. Life Ins. Co.*, 369 F. Supp. 2d 770, 778 (E.D. Va. 2005)

("the exclusions, read in conjunction, must not exclude death caused by the use of medicine on

the advice of a licensed medical practitioner where the medicine was prescribed to treat an

illness. The exclusions only exclude deaths caused by treatment for illness that do not result from

the use of medicine on the advice of a licensed medical practitioner.").

But other reasonable interpretations exist.  Others have found that the provisions operate

separately.  *See, e.g., Rustad-Link v. Metropolitan Life Ins. Co.*, No. CV 13-111-M-DLC, 2014

WL 3956761, at *2 (D. Mont. Aug. 13, 2014) (identifying that the medical-treatment and drug-

intake exclusions were "potentially conflicting" but finding administrator's denial of coverage

"on the basis of the general medical treatment exclusion" reasonable).  *See also Brown v.

Stonebridge Life Ins. Co.*, 2013 IL App (3d) 120295, ¶ 27, 990 N.E.2d 895, 901 (applying less

deferential state-law standards of insurance-policy construction and finding that "[w]hen medical

treatment involves the use of prescribed narcotics, as in the instant case, the medical treatment

exclusion applies on its own accord, without respect to the use of prescribed narcotics, and the

drug exclusion for nonprescribed narcotic use is inapplicable. We perceive no inconsistency in

the language of each policy.").

Unum's interpretation comports with these other interpretations.  Unum decided that the

medical-treatment exclusion applied—not the drug-use exclusion.  While Unum initially

imprecisely explained the exclusion—emphasizing the bodily disease portion, *see* doc. 57 at ¶

53—it consistently applied the same provision, *see id.* at ¶¶ 53, 74; consistently denied applying

the drug-use exclusion, *see id.* at ¶¶ 53, 75, and clarified during the review process that the

medical-treatment exclusion applied, *see id.* at ¶ 74.  Overall, Unum applied the medical-

19

treatment exclusion because it determined Mrs. Hanley suffered from "extreme coagulopathy, which was secondary to use of aspirin and Plavix for PVD." *Id.*

At most, competing interpretations of the plan exist. But when faced with conflicting interpretations, the Court may not choose its preferred interpretation, *see Donaldson*, 863 F.3d at 1040, nor may it interpret the language differently as an original matter, *see Manning*, 604 F.3d at 1038. Rather, the Court upholds the administrator's interpretation so long as a reasonable person *could* have reached a similar decision. *McIntyre II*, 73 F.4th at 1000 (quoting *Ingram*, 812 F.3d at 634). As the cases show, reasonable people have reached similar decisions. Thus, the Court finds Unum's interpretation reasonable.

Finally, assuming the Court must weigh the alleged conflict of interest as a factor, the conflict does not change the outcome. *See Ruessler*, 64 F.4th at 960. Here, Mr. Hanley identifies Unum's conflict of interest as the inherent financial conflict posed by Unum being both administrator and payor of benefits. Doc. 50 at 5. But Mr. Hanley provides no evidence that this conflict "warrants special weight because it is the kind of tension all trustees who decide claims and pay benefits must balance." *Ruessler*, 64 F.4th at 960–61. As such, the Court sees no compelling reason to disturb Unum's interpretation of the plan as an abuse of discretion. *See id.* at 961.

Because the Court finds that Unum reasonably determined that Mrs. Hanley's death fell outside the plan's accidental-bodily-injury definition and that Unum reasonably interpreted the plan provisions, Unum did not abuse its discretion. Thus, the Court denies Mr. Hanley's motion for summary judgment; having separately considered Unum's motion for summary judgment, the Court grants that motion for the same reasons as it denies Mr. Hanley's motion.

IV.     **Counterclaim summary-judgment motion**

A.     **Legal standard**

Under section 502(a)(3) of ERISA, a fiduciary may bring a civil action "to obtain other appropriate equitable relief . . . to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3).  This provision authorizes only "those categories of relief that were *typically* available in equity."  *Sereboff v. Mid Atl. Med. Servs., Inc.*, 547 U.S. 356, 361 (2006) (emphasis in original) (quoting *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 256 (1993)).

Such authorized relief includes constructive trusts or equitable liens on "particular funds or property in the defendant's possession."  *Id*. at 362 (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213 (2002)); *see also Dillard's Inc. v. Liberty Life Assur. Co. of Boston*, 456 F.3d 894, 901 (8th Cir. 2006) (applying *Sereboff*).  But it does not include legal relief, such as "compensatory damages," *Sereboff*, 547 U.S. at 361 (quoting *Mertens*, 508 U.S. at 255), or "the imposition of personal liability," *id*. at 362 (quoting *Knudson*, 534 U.S. at 214). Overall, the plaintiff seeks equitable relief if "it seeks (1) the specific funds it is owed under the terms of the plan . . . (2) from a specifically identifiable fund that is distinct from [defendant's] general assets . . . and (3) that is controlled by defendant."  *Admin. Comm. of Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan v. Shank*, 500 F.3d 834, 836 (8th Cir. 2007) (citations omitted).

B.     **Discussion**

The parties agree Unum brings an equitable claim, but they dispute whether Unum seeks equitable relief.  The parties agree that Unum satisfies the ERISA definition of fiduciary, doc. 62 at ¶ 3; that the plan terms require reimbursement, *id*. at ¶ 7; and that Unum overpaid, *id*. at ¶¶ 24–25.  But the parties dispute the existence of an identifiable fund.  *Compare* doc. 61 at 1

("Unum is unable to identify that the overpayment is in Mr. Hanley's possession separate from his other assets.") *with* doc. 53 at 1 ("Unum seeks to recover traceable funds that are in the possession of Mr. Hanley."). Mr. Hanley mainly argues the funds cannot be identified because Unum commingled the funds with Mr. Hanley's general assets. Doc. 61 at 2–3. In contrast, Unum argues equitable tracing rules—specifically, the lowest-intermediate-balance-rule—allow it to identify specific funds regardless of commingling. Doc. 53 at 4–5. For the reasons stated below, the Court finds that Unum seeks equitable relief.

The parties cite to three Supreme Court cases to support their positions. *See* doc. 61 at 2 (citing *Sereboff*, 547 U.S. 356); *id*. at 4 (citing *Knudson*, 534 U.S. 204; *Montanile v. Bd. of Trustees of Nat. Elevator Indus. Health Benefit Plan*, 577 U.S. 136 (2016)); *see* doc. 53 at 2 (citing *Montanile*, 577 U.S. at 141). The cases address ERISA reimbursement provisions and delineate appropriate equitable relief under section 502(a)(3).

First, in *Knudson*, the Court found no equitable relief. *Knudson*, 534 U.S. at 221. The beneficiaries never gained possession of funds sought by the plan fiduciary. *Id*. at 214. And as the Court later explained, this lack of possession was dispositive:

> [O]ne feature of equitable restitution was that it sought to impose a constructive trust or equitable lien on "particular funds or property *in the defendant's possession*." That requirement was not met in *Knudson*, because "the funds to which petitioners claim[ed] an entitlement" *were not in Knudson's possession*.

*Sereboff*, 547 U.S. at 362 (emphasis added) (first quoting *Knudson*, 534 U.S. at 213; then *id*. at 214); *see also Montanile*, 577 U.S. at 143 (cleaned up) ("[T]he restitution sought in [*Knudson*] was legal—not equitable—because the specific funds to which the fiduciaries 'claimed an entitlement were not in the defendants' possession." (quoting *Knudson*, 534 U.S. at 214)).

Here, the parties do not dispute Mr. Hanley's possession of the funds. The parties agree Mr. Hanley possessed the overpayment; Unum gave it directly to him. Doc. 62 at ¶¶ 11–12. As

such, *Knudson* alone does not decide this case.  *See Sereboff*, 547 U.S. at 362 ("That impediment to characterizing the relief in *Knudson* as equitable is not present here.").

Second, in *Sereboff*, unlike *Knudson*, the Court found that the relief sought was equitable and thus permissible under section 502(a)(3).  *Id*. at 369.  Specifically, the Court relied on *Barnes v. Alexander*, 232 U.S. 117 (1914), and determined that the plan provision created an equitable lien by agreement, allowing the plan fiduciary to follow the funds recovered by the beneficiary and "impose on that portion a constructive trust or equitable lien."  *Sereboff*, 547 U.S. at 364 (citing *Barnes*, 232 U.S. at 123); *see also Barnes*, 232 U.S. at 121 (citations omitted) ("And it is one of the familiar rules of equity that a contract to convey a specific object even before it is acquired will make the contractor a trustee as soon as he gets a title to the thing.").

Here, like *Sereboff*, Unum seeks to recover under a plan's reimbursement provision.  *See* doc. 62 at ¶ 7 ("Unum has the right to recover any overpayments due to . . . any error Unum makes in processing a claim" and the recipient "must reimburse [Unum] in full.").  With this provision, Mr. Hanley previously promised that if he acquired an overpayment and Unum sought reimbursement, then he would reimburse Unum.  Much like the promises in *Sereboff* and *Barnes*, this created an equitable lien by agreement.  *See Sereboff*, 547 U.S. at 364.

Third, in *Montanile*, the Court determined that dissipation prohibits equitable relief: "when a participant dissipates the whole settlement on nontraceable items, the fiduciary cannot bring a suit to attach the participant's general assets under § 502(a)(3)."  577 U.S. at 139.  Dissipation occurs when a person expends "the entire identifiable fund on nontraceable items (like food or travel)."  *Id.* at 145.

Here, the problem lies not with dissipated funds but with commingled funds—Unum's depositing both Mr. Hanley's funds and the overpayments into the same account.  *See* doc. 62 at

¶¶ 11–12.  In contrast to dissipation, commingling occurs when a party mixes personal funds with funds of another.  *Commingle, Black's Law Dictionary* (11th ed. 2019).  While *Montanile* clearly bars equitable recovery when dissipation occurs, it does not apply the same prohibition to commingling.  In fact, "commingling" only appears three times in *Montanile*, and the references appear in the same paragraph:

> To the extent that [equity] courts endorsed any version of the swollen assets theory, they adopted a more limited rule:  that commingling a specifically identified fund—to which a lien attached—with a different fund of the defendant's did not destroy the lien.  Instead, that commingling allowed the plaintiff to recover the amount of the lien from the entire pot of money.  Thus, even under the version of the swollen assets doctrine adopted by some courts, recovery out of Montanile's general assets—in the absence of commingling—would not have been "typically available" relief.

*Montanile*, 577 U.S. at 149 (citiations omitted).  If anything, this quote shows that equitable relief could occur even if the party commingled funds.  *See also Restatement (First) of Restitution* § 215 cmt. a (1937) ("the mere fact that the property or its proceeds has been mingled with the wrongdoer's own property in one indistinguishable mass does not prevent the claimant from following his property").  In light of these three cases, Unum may recover the overpayment as equitable relief if it can identify specific funds within the commingled funds—distinct from the Mr. Hanley's general assets and still in his possession.

Now, the Court addresses whether Unum may use the lowest-intermediate-balance rule to trace its overpayment in Mr. Hanley's commingled funds.  In cases addressing equitable relief under section 502(a)(3), neither the Supreme Court nor the Eighth Circuit has addressed the lowest-intermediate-balance rule.  Consistently though, "[t]o determine how to characterize the basis of a plaintiff's claim and the nature of the remedies sought," the Supreme Court has "turn[ed] to standard treatises on equity, which establish the 'basic contours' of what equitable

relief was typically available in premerger equity courts." *Montanile*, 577 U.S. at 142 (quoting *Knudson*, 534 U.S. at 217).

The secondary sources make clear that equity courts employed various tracing methods, including the lowest-intermediate-balance rule, to identify funds for both constructive trusts and equitable liens. *See* 2 Dan B. Dobbs, *Law of Remedies* § 6.1(4) (2d ed. 1993); Austin W. Scott, *The Right to Follow Money Wrongfully Mingled with Other Money*, 27 Harv. L. Rev. 125, 129–34 (1913); *see also* George T. Bogert, *Trusts* § 162 (6th ed. 1987) (describing tracing rules). "The lowest balance rule states that the plaintiff can never trace to a sum greater than the lowest intermediate balance in an account between the time of the deposit and the time of the tracing." 2 Dobbs, *Law of Remedies* § 6.1(4), p. 22; *see also Meyer v. Norwest Bank Iowa, Nat. Ass'n*, 112 F.3d 946, 951 (8th Cir. 1997) ("Under the lowest intermediate balance rule, it is assumed the traced proceeds are the last funds withdrawn from a contested account. Once the traced proceeds are withdrawn, however, they are treated as lost, even though subsequent deposits are made into the account." (citing *In re Columbia Gas Sys., Inc.*, 997 F.2d 1039, 1063 (3rd Cir. 1993))). Further, under this rule, "[t]he claimant, in effect, is allowed to trace into that portion of the commingled fund (or any withdrawal from the fund) that equals but does not exceed the lowest balance reached by the fund between (x) the point at which claimant's property is added to the fund, and (y) the point at which the withdrawal is made or the fund is apportioned." *Restatement (Third) of Restitution*, § 59 cmt. d (2011).

With this, the Court agrees with Unum that it may employ the lowest-intermediate-balance rule to trace its overpayment into Mr. Hanley's commingled assets. On December 24, 2021, and January 13, 2022, Unum deposited two amounts—$46,150 and $91,650, respectively—into Mr. Hanley's retained-asset account that Unum later determined to be

overpayments.  Doc. 62 at ¶¶ 12, 23–24.  The two deposits amounted to $137,800, and at the

time of the second deposit, the full account contained $265,305.08.  Doc. 54-3.  After the

December 24 deposit, the retained-asset account remained well above $46,150.  *See id*.  And

after the January 13 deposit, the account remained above $137,800.  *See id*.  Then on February

14, Hanley transferred $264,853.73 from the retained-asset account to the Edward Jones holding

account.  Doc. 62 at ¶¶ 13–15.

 About two weeks later, Hanley made another transfer; on March 1, Hanley transferred

$200,000 from the holding account to the Edward Jones investment account.  *Id*. at ¶¶ 17–18.

Between the February 14 deposit and March 1 transfer, the holding account remained above

$137,800.  *See* doc. 73 at 92–95.  And since the March 1 transfer, the lowest-intermediate

balance of the investment account has been $191,001.11.  Doc. 62 at ¶ 20.

 With this and applying equitable tracing rules, Unum can trace the initial overpayment in

the retained-asset account to the holding account and then to the investment account.  Between

the time Unum deposited the overpayments in the retained-asset account and Hanley transferred

the funds to the holding account, Unum's portion of the commingled funds remained below the

lowest balance.  *See* doc. 54-3.  Then between the time Hanley deposited the funds into the

holding account and transferred the funds to the investment account, Unum's portion of the

commingled funds again remained below the lowest balance.  *See* doc. 73 at 92–95.  Finally,

since being transferred to the investment account, Unum's portion remains below the lowest

balance.  Doc. 62 at ¶ 20.  As such, Unum has identified its $137,800 overpayment in Hanley's

investment account.

 With an equitable lien by agreement, either a constructive trust or equitable lien may be

imposed on the identified fund.  *See Sereboff*, 547 U.S. at 364.  Because Unum asks for the

specific overpayment, the Court imposes an equitable lien on Hanley's investment account to the extent of $137,800. *See* 2 Dobbs, *Law of Remedies* § 6.1(4), p. 16 n.2 ("To say there is a constructive trust on an identified fund is much the same as saying there is an equitable lien on the whole mass for the identified amount. The difference in the two forms of statement is only that a constructive trust may warrant return of specific property and recovery of gains attributable to an identified share.").

## V.   Conclusion

Accordingly, the Court denies Riley Hanley's [49] motion for summary judgment. Further, the Court grants Unum's [46] motion for summary judgment. Finally, the Court grants Unum's [52] counterclaim motion for summary judgment. The Court imposes an equitable lien on Hanley's Edward Jones investment account for $137,800. The Court awards costs to Unum. A separate judgment accompanies this order.

So ordered this 20th day of December 2023.

_____
STEPHEN R. CLARK
CHIEF UNITED STATES DISTRICT JUDGE